We have Atlantic Specialty Insurance v. and others v. Porter. Mr. Wilson. Good morning, Your Honors. May it please the Court, Andrew Wilson for Plaintiff's Advance on Specialty and Chad Gonzalez. The Court is apparently aware this is a boat fire case. And basically this matter involves a boat fire in which an immaculately maintained luxury yacht caught fire with... Does it have any crewmen? No. Why would you? No stowaways. Not big enough? No. Okay. But the owner was Chad Gonzalez, and he'd use it for recreational purposes with his family. The boat was moored in Slidell in a marina there across the lake, which is just outside the city. And the boat caught fire on its slip, and some people in a nearby restaurant saw the smoke coming up. The fire department showed up, put the fire out, and from there the insurers sent three investigators to take a look at the situation and make a determination as to what caused the fire. So the insurers sent three different experts, basically in seriatim. The first was a marine surveyor who went out to kind of get a feel for what happened. That's Little. That would be Captain Guy Plaisance. Oh, that's Plaisance the hose. He's the hose guy. He's the marine surveyor. And then the second, he realized that this was an electrical fire immediately, so he contacted a cause and origin expert who was Gary Jones, and then they realized that the cause of the electrical wiring meltdown had to be determined by an electrical engineer. So they called out all the pigtails, and nobody knew where it came from. The energy? Well, it's kind of hard to reconstruct an electrical fire if you pull out the wiring, and if you're trying to go back to sources, that's what I got from the marines. He labeled each of the wires when he took it out of the photographs that show that they're all matched up. The wires that were cut where the original bundle was removed at the origin point were matched up, and if someone wanted to make a determination at a later time, that was possible. Well, I mean, just to cut times tight, why isn't this a sort of situation where Judge Vance heard the evidence and said, you know, I credit Natale, it's indeterminate, I just don't see the proof by preponderance that the pigtail corrosion caused the sofa fire? Why would we disturb that unless your first argument has to be she committed do-bear error, keeping Little and Plaisance out? Well, certainly our position is that there was do-bear error in keeping both of them out. That should have been a determination. But isn't that essential for you to prevail? No. The case law indicates that you don't need an expert in order to prove a retribution claim. But what proof would you point to that was in this trial? Because an origin was undisputed, the wires, which were factory installed, melted and caught fire and set the sofa and the framework on fire, which were also factory installed. That's the starboard side. But who did Jones or Natale, did anyone say the fire was caused by the portside pigtail wet bar situation? Is there any? That would be Troy Little's. Right. So, therefore, we're back to my position, which is we wouldn't reverse it unless we found that the excluded Little testimony was error. Or am I wrong? Well, I believe that retribution does not require that level of proof. Basically, what — Why not? But what proof did you have that would show — what proof would you point to from anyone that testified? Or would it have to be the use of res ipsa to get there? Well, the district court basically treated this particular case not as a retribution claim, but as a products liability claim. Even at the pretrial conference, she said this is a products liability claim. It's not a retribution claim. I said it is a retribution claim because in a situation where the product destroys itself, that's retribution. Products liability is if you have secondary damages as a result of the destruction of the product that's manufactured by the manufacturer. So we got that straight. We briefed that. But she still wanted to handle this as a products liability case, where we had to show which of the appliances or devices or elements of the boat that were all manufactured, factory-installed, failed to cause the factory-installed wiring to bypass the factory-installed circuit breakers to cause the fire. And that's a burden of proof that we shouldn't have to have in a retribution claim. If this were products liability, it would be strictly design, and that would be Chad Gonzalez's claim, and that's where we go to the wet bar. And the only indication as to a possible short was that the water dripped down from the wet bar, and a wet bar shouldn't actually leak like that unless there's something wrong with it. So the water came down onto the pigtail that was directly under the wet bar. What's your best retribution case in Louisiana that would exist in spite of a prior owner? I don't know how long Kelly had this boat. Two years? Yes, that's correct, Your Honor. So what's your best case that still assigns exclusive control to the manufacturer when there is a prior owner of that time? Well, the Louisiana Supreme Court has relaxed the exclusive control issue, and the spot case, even though it's not favorable in terms of the outcome, the spot does indicate that you do not have to say that the manufacturer maintained complete control or the repairer retained complete control. Those cases go just the opposite way. And there also was a middle district case, Williams, which actually used and relied upon spot to say that you look to not exclusive control in the literal sense, but whether under the circumstances, I quote the Court, that the exclusive control requirement is satisfied if the circumstances indicate that it is more probable than not that the defendant caused the accident and other plausible explanations do not appear to be the cause of the accident. In this situation, our cause and origin expert, Gary Jones, went out to the scene and had immediately established that nearly every other possible cause was out. So what he did was he said that there's no lightning, there's no vandalism, there's no arson. Well, you did have the owner leaving a heater connected. That's correct, Your Honor. And not regulated. That's an unused. Putting a heater in one side and leaving it on for an extended period of time, why isn't that just intuitively a powerful example that you're now beyond the control? I mean, the owner now is bringing in a potential fire source. Well, potentially, but at the same time, the heater had a thermostat on it that only kept it at a certain level. The reason why he had it there was to keep it dry and to prevent the type of. It was on a thermal switch? It had a thermostat within the device itself. And also, that particular heater was on AC current. This fire was DC. What was the marina hookup? I'm sorry? There was a constant marina hookup, right? That's correct, Your Honor. What was that? That's the AC going to the heater? That's the DC. Oh, that is the DC. Going ashore. And there's no testimony that there's anything wrong with having a DC hookup maintained. There's nothing. That's typical. I mean, everyone does that. So the judge found that to be an indication of negligence, which makes absolutely no sense. None of the findings that the court made as to what was done wrong with the boat or what went wrong with the boat supposedly were based on any evidence. So they said that maybe this guy over in Tampa did some repairs. Well, we got the repair records, and they were irrelevant, so we moved to exclude them. The judge granted that and then said that there may have been repairs. But we had the repair records, and we presented the repair records to the opposing counsel. They reviewed them. They tried to use them, but they were just distracting because they had no indication of any type of repair in that factory-installed sofa where the factory-installed wires were there and supposedly protected by factory-installed circuit breakers. And some factory-installed device somehow triggered that and bypassed the circuit breakers. That's all factory-installed, and that has nothing to do with maintenance. It has nothing to do with any third parties. And again ---- Roberts. So your answer to their expert's comment that there were circuit breakers on the portside pigtails is that there was a bypass of those circuit breakers? That was Mr. Little's theory. Okay. I know, but that's Little, and that was excluded. Right. And that was excluded. But what we're saying is for that charge to get to these wires and melt them, some circuit breaker on the boat did not function correctly and allow that to happen. In addition, this particular model had a prior history of a circuit breaker failing in other equipment on the boat, and that caused an engine room fire. And the manufacturer's response was to immediately do a recall and a whole different approach. No, you're stating that, and you stated that, but they responded in their brief that the facts of that one other fire had to do with a light that had been brought on. Is their characterization of that one other fire wrong? No. It's correct in the sense that it was within the device itself, but the circuit breakers on the boat did not protect the boat from another engine fire. So what I'm saying is no connection. There's no suggestion that one other fire in one of these other boats originated in the pigtails below the wet bar. No. This was the only one. The prior incident was related to another device on the transom, but that was one incident in isolation, yet they did a total recall on the boat as to that particular equipment, and then the vendor that supplied it fixed it. But that particular device did not protect the boat from an engine room fire. There was no circuit breaker protection. Here we have no circuit breaker protection. The problems in the wiring. I thought the judge said that there were circuit breakers. There were, but they didn't work, obviously. If the wires melted, there's no circuit breaker protection. But was there evidence that the circuit breakers did not function, or are we just assuming that because of the fire? Right. Those wires should have been protected by a circuit breaker. And what Mr. Little's theory had been is that the circuit breaker had been bypassed, and that was the only plausible theory, other than the fact that the only other way that this could happen is that the circuit breakers failed and didn't protect the factory and soil wiring. What's your best case that the district judge abused her discretion in excluding Little's testimony? Well, in his particular situation, she appeared to not like his conclusions and felt that he should have used the NFPA 921. And essentially, with that particular standard, that is not required to be used, but it certainly can be used to rely upon it. In fact, Gary Jones used that in his cause and origin assessment. I thought she said that in his deposition he admitted he wished he could have tested it further, X-ray, metallurgically. Well, he did after the opinions from the opposing experts came out. Then he said, well, we're going to bring this up. He was ready to participate in more testing before the opinions came out, and then they decided they didn't want to do that. So I think we're getting to a point where the experts are simply used for tactical purposes. These three guys went out there to find out exactly what happened. Oh, you've always been. But, I mean, it's reaching an extreme, it seems, these days. I guess my question to you is what's your best case on 702 that it's an abusive discretion to exclude an expert with this level of cognitive testing? Well, he's fully qualified. Not the facts. What's your authority? What case law? Where, yes, a trial judge was reversed for performing the gatekeeping function. Well, we've cited a number of different cases within the brief as far as just general Fifth Circuit law, but the point with Megan is that the cognitive we had actual citations where cognitive testing was accepted. And those cases say that what he did was sound, and she just threw that out. She said, we're not going to do that. He also should have used the NFPA, which he's not required to do either. We cited case law to that effect as well. So we show that the NFPA is not binding. Cognitive testing is fine. And he actually did a physical hands-on examination. His opinion, when we say cognitive testing, what he did was he went on the boat. These guys didn't do anything. They walked around the boat for an hour and a half, two years after the accident. These guys went out there right after the accident and reached their conclusion from doing a hands-on examination. Using their experience, they drew conclusions as to why this could possibly happen. And so little was the only plausible explanation. Again, Gary Jones ruled out everything else. So there's no spontaneous combustion. There's no arson. There are any number of causes, but he ruled all of those out, including the shore wiring. They took readings, and Troy Little was there for all of these. If you match up Judge Vance's alternate plausible explanations, each one was rebutted by Jones at trial? Jones rebutted most of them. Most of them. But what she did was she came up with explanations that are not on the record. There's no evidence to support them, and that's the clearly erroneous part. Well, what about the fact that there was a prior owner? We just don't know. But that, to have to prove, she's creating new law. She's saying this is a universal negative, that the plaintiff in a retribution case has to rule out every possible cause. So she comes up with this idea that a prior owner did something to this boat. There's no evidence of that, and we got the repair records. They were excluded, but they were available so that they are part of the record. But what we're saying is there's no evidence of the repairs. She just made it up. And so she kept adding different things. She said that after ruling that Gary Jones initially was correct in saying that the heater was not a cause since it was not affected and it worked after the incident, then she said that that was possibly a cause, which makes no sense. In a motion to eliminate, she had specifically found that he had correctly ruled that out. So it was like we went backwards into the record, and I guess we didn't see that coming as far as because she had already ruled these out, the repair records, that the heater was not a factor. Not one of those was a factor, yet that's what she based her opinion on, and there's no evidence in the record to support those. Thank you. May it please the Court, my name is John Murrell. I am here as counsel for the appellees. First of all, and very briefly with respect to the retribution claim, in their briefs at least, the appellants have suggested that Judge Vance misapplied the law, that she committed legal error by requiring them to prove the existence of a specific defect. They took the position in their briefs, we're not required under Louisiana law to prove a specific defect. I've got a string side of cases I can provide to the Court, if you're so inclined, where Louisiana courts have dismissed retribution claims because a plaintiff failed to prove a specific defect. I think the case that's most appropriate was cited by Judge Vance in her written rulings. It's the Commercial Union case, 457. That a boat catches on fire sitting there in the slip tells me very powerfully that there is a defect. You say, well, it's just indeterminate. We know it's a fire, and the only possible source of this fire is electrical. I don't think that's an argument. I mean, we don't have an intruder. We don't have somebody burglaring the boat and whatever. You just have an electrical fire, correct? And so you don't know what caused the electrical fire. That is correct. However, electrical fires are by electrical installation systems called a whole lot of fail-safe devices, et cetera. Is it the case that a circuit breaker would have prevented these fires or not? You say, well, you don't know. Well, I believe. I believe, Your Honor. If the current had been turned off, it wouldn't have been hot and it wouldn't have melted. Now, that's kind of simple. I know that's simplistic, but help me with that. Well, Mr. Boyce testified. Mr. Boyce is – I don't remember his exact job title, but he designed the electrical systems on these boats, and he testified at trial. It was a design that didn't fail, of course. Well, he was asked, but you posed the question, why didn't the circuit breakers fail? Well, I think one plausible answer to that is this fire did not occur in the manner suggested by the appellants. He was asked on cross-examination at trial. Did he have an explanation for then how it started, for one, for that? I'm sorry? Did he have an explanation for how it did start? He did not. He did not have an explanation, Your Honor. To that point, though – Did Jones? If the product were not defective, how could the fire have occurred? Well, I think that we would take the position, Your Honor, that somewhere on this boat there was a defect. But to suggest that that defect is attributable to Porter, we don't agree with that at all. It's not a defect about the vessel. It's not that you've got something wrong with the other part of the craft. It is specifically something is wrong that infected the electrical system itself, correct? Well, yes, and let me be careful. I want to back up 30 seconds and correct something I just said. We don't acknowledge that there was a defect anywhere on this vessel. We certainly acknowledge that the ship caught fire. There's no disputing that. But it's the appellants, it's the plaintiff's burden to prove a defect, and they did not do that. Now, they've argued that they're entitled to an inference of negligence on the part of my client, Porter, under the doctrine of res ipsa. Now, Judge Vance ruled that res ipsa, which is based in tort, is not available to a plaintiff to help them prove a redhibition case which is based in contract. She did not cite any case that supports that. And in all candor with the court, when we did the research, we did not find a case that said that either. However, there are multiple Louisiana court decisions that say a defendant in a redhibition case cannot defend that case by claiming the affirmative defense of comparative negligence. Why not? Because comparative negligence is based in tort and is therefore not available on a redhibition contract claim. So Judge Vance's analysis, it's conceptually the same. They should not, just as I cannot defend a redhibition case by pleading comparative fault because it's based in tort, they cannot prove their redhibition case by relying on res ipsa because it's based in tort. So I think she was correct on that aspect of the res ipsa argument. The other thing is we don't believe you even get to the question of whether. Suppose Mr. Gonzalez took delivery of this vessel and your company delivered it to him and parked it in the slip and he said, great, I'm going to bring the family out here tomorrow. And that night the thing burned up just like it did here. It's a different. And you say, well, we don't know how it happened. Are you asking the question based on the timing, if it had happened right away? That's my question. I said, let's just suppose that Gonzalez took delivery of the vessel and the porter delivered this vessel for them and put it in the slip for them and it will be ready for you tomorrow, bring your family out here, and it burns up that night. Now what? They've got to come in and prove that this thing was defective at your hands? Yes, according to the commercial union case, which Judge Vance cited in her opinion. The moment title passed, then you're not responsible. They've never touched it. I'm pushing you on control. Well, and I recognize that. If you might, in the commercial union case, which was a car fire, it wasn't a boat fire, the plaintiff in that case had the car for three days. Now that's different from what you proposed. You proposed an immediate transfer of title. But in that case, and if you would allow me to read what the court said in that case, there's no question that the car burned and there's no question that the owner was using it for her own affairs and the car certainly looked all right to everybody concerned. The problem here is that the plaintiff has some duty to suggest the cause of the fire, some defect, latent or obvious. No defect of any kind has been suggested or proved by the plaintiff. Isn't it a suggestion of a defect that suggests that this fire could not have occurred but for the failure of the design system to prevent the fire, that is, circuit breakers and so forth, and the circuit breakers didn't break. They should get an inference of nothing. There's no suggestion here that there's some outside source of fire here. But you said, well, no, no, we don't suggest it. We don't admit anything. Well, I want to be clear. I'm understanding the question in the sense of an outside source of fire. I think that's... Outside the hull of the vessel itself. Well, there's no physically... Lightning, you have lightning as a problem. There's no suggestion about that. But here's another possible alternative cause that was not referred to by Judge Vance in her brief but is evidence that the plaintiffs introduced at trial. It is Record on Appeal 1784. Just a few months before this fire occurred, Mr. Gonzales brought the boat to Cassataban Marina and had the batteries, the DC batteries, replaced on this boat. They introduced that evidence at trial. I didn't introduce it. Were those batteries defective? Did those defective batteries cause the fire a few months later? Or if the batteries weren't defective... Where were these batteries? What function? Where were they installed? Well, they supply the DC current to the boat when it's not connected to shore power. That's what I'm trying to understand. And so just a few months before this fire occurred... I'm sticking with the reasons given by Judge Vance. Which was not refuted by Jones? Which alternate plausible theory, independent of exclusive control of Porter, did she list that wasn't refuted by their judge? The prior owner, to begin with. To begin with, the prior owner. Two years of prior ownership, there's no evidence in the record whatsoever to eliminate anything that happened when the vessel was owned by the prior owner. This court's decision in Winans... I have the site. It's 705 Fed 2nd, 1449. Makes it clear. It's the plaintiff's burden to disprove what might have happened on a prior owner as a cause of the fire. They didn't do that. There's no evidence in the record at all. The second thing she referred to in her list of decisions that they did not refute is that it might have been caused by another piece of equipment on the boat. Now, Mr. Wilson, when he stood up here and argued, said, factory installed, factory installed, factory installed. As though everything on this boat, five years after it was purchased and owned by a prior owner, was still the factory installed equipment. There's no evidence of that. That's their burden to show that alternative causes of the fire could not have caused this. Mr. Boyce testified that there were four conductors that passed through that pigtail and passed through the wiring harness on the other side of the boat where the fire occurred. So you would think those would be critical pieces of evidence that they would want to investigate as a potential cause. One of them serviced the galvanic isolator. One of them serviced the stereo. One of them serviced the bilge blowers. They didn't do anything to eliminate those. Their response is that, well, they were factory installed. We don't know that. There's no evidence in the record whatsoever that the prior owner didn't install some new aftermarket stereo. I assume that's pretty common in boat owners. It's certainly common with my teenage sons. Well, you're not offering any suggestion of that either. Your people are on there, and I suspect that if they had a lot of post-factory installations of any consequence, we would have heard about that from you. I mean, that would be the first thing you'd look at, and I'm confident you did. You didn't find one, but you said, well, they didn't show the negative of that. So it amounts to it. If I might also, Your Honor, on the res ipsa issue, I don't know how they get around Cangellosi. I don't know how the appellants get around the Louisiana Supreme Court case of Cangellosi. Judge Higginson several times during arguments today in this and the prior cases, you've asked the question of attorneys, what's your best case? What's your best case? Well, on the res ipsa issue, certainly Cangellosi is one of our best cases, and the reason why is that in that case, the Louisiana Supreme Court said the doctrine of res ipsa merely assists the plaintiff in presenting a prima facie case of negligence when direct evidence is not available. Their theory of this case is that water leaked through the wet bar into the engine room on the pigtail, corroded the pigtail over time. It eventually short-circuited, energized the conductor on the other side of the boat, and started a fire under the sofa. And all of those items were preserved and survived the fire. This boat was structurally sound after it burned. It was totaled because of smoke damage. But the parties were able to go on there and remove this evidence, the pigtail, the breaker boxes, the fuses, the wiring harnesses, the wet bar, all of that information, all of that evidence is still there available to them. They chose not to do anything to test it. They can't tell you today whether or not there's any short circuit at all, anywhere in that pigtail connector, because they never did anything to test it. They can't tell you if the corrosion that they observed on that pigtail connector was caused by the fire or was a cause of the fire. The trial record doesn't contain that, but I thought Little was willing to give his expert opinion that it was caused by that. I don't know that. No, I don't think that's with all due respect, Judge Higginson. In fact, if I might, Mr. Little's testimony, one of the panel members asked earlier about what Higginson said. This is what Higginson himself said. I'm sorry about what Little said. This is what Mr. Little himself said. My intent was that we would jointly be doing some laboratory analysis, including X-raying the pigtail, metallurgy, destructive analysis if necessary on the wiring harness to identify the actual wires as to how they related back to the pigtail. He did acknowledge that he would have done more, but I thought he independently also said what he'd seen, he could then give the opinion that it started with the pigtail corrosion under the water bar. Well, my characterization of that, Your Honor, yes, he did say that. I think his testimony was, that's my story and I'm sticking with it. I didn't do any testing, but that's my opinion and I'm sticking by it. He absolutely said that, Your Honor. On the wiring harness, Mr. Natale testified at length at trial about the kind of trace testing that could have been done on the wiring harness. Before the harness was cut out, trace testing might not, it might not have shown which specific conductor caused this fire, but what it would have done and what he testified it would have done was, it certainly would have ruled out what did not cause the fire and by process of elimination helped to refine theories about what did cause this fire. Unfortunately, when the plaintiff's experts cut this wiring harness out of the boat before doing that trace testing, that option was lost to us. The valuable trace testing that could have been done on this wiring harness was never done. This same scenario, similar scenario, occurred in the Louisiana case of Lawson, which was cited by Judge Vance. Lawson versus Mitsubishi, 9-38 Southern 2nd 35. In Lawson, an airbag inadvertently deployed and injured the lady that was driving the car. And the lady, a few months later, brought the car to a mechanic, who she later called as an expert at trial, and he dissembled the airbag system. He took it apart, he expressed some opinions about what he found, but by taking it apart, he prevented the other side's experts from ever having an opportunity to do their own testing. And in that case, the Louisiana Supreme Court said, we do not believe that the plaintiff should be able to take advantage of the doctrine of res ipsa since direct evidence of a possible misalignment was available prior to plaintiff's experts' disassembly of the supplemental restraint system. It's the same thing that happened with this wiring harness. We would have loved to have gone on the boat and done that trace testing, but once they cut it out? Well, you say that, but what's the chronology here? I thought your people just didn't get there for a long, long time. Well, what happened is, what happened, Your Honor, is that when they, before my client was ever contacted, their experts went on the boat and they opined that this was an AC fire, not DC, that their original opinion was that this was an alternating current fire that originated at the Molex connectors. It's just a connection board where AC wires are coming in and AC wires are going out. When they invited formula to the fire, they told formula. I think Mr. Boyd testified about this at trial. Formula did not go to that original inspection having any inclination that anyone was suggesting they had done anything wrong. They already were led to believe that the cause had been identified. It was this third-party Molex connector board. The Molex representatives were also invited to the fire. So you are correct. When the Porter team originally responded to the invitation to attend that inspection, they did not bring experts with them. But it wasn't because they simply buried their heads in the sand. They had no understanding at all that they were suspected of a defect that originated with them. In fact, they were led to believe just the opposite, that the cause had already been identified in these Molex connections. So that's my response to that. I've got a minute left. I think I've said about all I want to say. I'll be happy to answer any further questions. Thank you very much. First off, I'd like to respond to the contention that they didn't bury their heads in the sand. They did exactly that. They were told that there was a likelihood that this was a problem associated with the manufacture of the vessel. That's why the Porter's representatives were invited. It doesn't make any sense otherwise. So they had Molex as a preliminary finding until Troy Little looked at what the situation was. But they invited Porter right out of the box because they knew this was some type of wiring issue and most of the wiring would have been factory installed. And so Porter was certainly implicated. So that statement is simply not true that they didn't bury their heads in the sand. They did exactly that. And they waited for two and a half years to request the opportunity to go on the vessel, which was a few weeks before the deadline for experts. That's the reality of the situation. And then basically at that point we were in the process of trying to do some joint testing because you could still do all the testing on the wiring if that's what was really desired. But they had no intention of doing that. In addition, Mr. Little had cut the wires. He labeled everything so he could match it up if there was any issue on that. So all that is not true as well. So what we have here is a situation where basically we felt that we had done what we needed to do under Louisiana laws to Red Abyssinian because we're entitled to build a circumstantial case. And, in addition, we could use IPSA normally to do that. Judge Vance ruled that you can't use race IPSA in a Red Abyssinian case, which was wrong. And that was what started her reasoning. And then she went on to say why she was right in reaching that conclusion. That was an error of law. Then she went on to say that you can't use race IPSA because of the exclusive control issue. And the exclusive control issue is basically thrown out by the spot case as interpreted by the Middle District and Williams. So we have situations where you clearly can use circumstantial evidence in order to establish a Red Abyssinian claim or a products liability claim or general manufacturer liability. For instance, in another case, we cite Abare v. Big Jims, 241 Southern 2nd, 84. In that case, there was a receptacle underneath the trailer that caught fire and caused this particular trailer to incinerate. So the whole case, although they don't mention race IPSA in it, basically it's a circumstantial case and they established liability on the part of the manufacturer because this receptacle on the bottom of the trailer failed for unknown reasons. But it was in fact reinstalled and no one had to take it apart and no one had to bring out all the repair records. And that case specifically goes to that type of circumstantial case. They're all over Louisiana law. In addition, we cited the Ryan case, which . . . I mean, it was a bench trial, so Judge Vance heard it all. She just decided you didn't meet your burden of proof. Well, she brought in other evidence that doesn't exist in order to justify her findings. Yeah, but he just said that there were two points that did, the prior owner and other equipment. Well, we had the prior repair records and they were provided to opposing counsel. We moved to exclude them. Those were all the repair records. They're in the record. But we moved to exclude them because they don't say anything. So there's no indication of any type of repairs that could possibly have disrupted the factory-installed wiring, which melted, or the circuit breakers, which melted. And there's no indication of any replacement parts. Chad Gonzalez testified that he never did any type of installation of any new equipment. That was never his position. He never did anything like that. He maintained it well. And they did hose it down a lot, and that leads to Captain Plazon's doing a recreation of what went on on a regular basis because Chad Gonzalez had hired somebody to go out and hose down that particular area, particularly the area around the wet bar where you get mud, mud bugs and all the bugs like rum drinks and whatnot. So they would hose that down on a regular basis. So you would have the powerful spray, and that's why we thought Captain Plazon's testimony was important. But the big issues that we had with the exclusion of Mr. Little were that the Court focused on the 921, saying that he had to rely on that in this Fifth Circuit jurisprudence, which we've cited, saying you don't have to rely on that. Then there's additional findings that she basically didn't like his conclusions, and she just reached that difference of opinion before trial when she should have allowed him to testify under the jurisprudence in this circuit and all the cases that we've cited along those lines. He should have been allowed to testify and to bring out all these issues associated with his analysis and his investigation, and that he came up with the only plausible theory. So we have Gary Jones ruling out any other cause. We have Mr. Little coming up with a whole theory as to how this happened, and there was no other plausible explanation. The Porter experts show up two and a half years later, walk around the boat for an hour, stare at a few things, and then conclude that this is all inconclusive, we can't reach a conclusion here. And it had nothing to do with reality, and they could have been there and been part of a true investigation early on, which is what Mr. Little had done. My time is up. Thank you. Thank you, gentlemen. That concludes this panel's arguments for the day.